## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **TOWN OF PLATTSBURGH,** | **Case No.** 8:25-cv-00099 |
| *Plaintiff*, | **Judge:** DNH |
| | **Magistrate:** DJS |
| *v.* | |
| | **COMPLAINT** |
| **THE UNITED STATES OF AMERICA,** | |
| *Defendant*. | **Jury Trial Demanded** |

## COMPLAINT

Now comes**,** the Town of Plattsburgh ("Plaintiff") to file this complaint under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), against Defendant, to recover past, present, and future damages caused by ongoing contamination of Plaintiff's drinking water supply with per- and poly- fluoroalkyl- based substances ("PFAS") disposed of at, or otherwise released at the Town of Plattsburgh.

## THE PARTIES

1.      **Plaintiff, Town of Plattsburgh** is located at 151 Banker Road, Plattsburgh NY 12901.

2.      Plaintiff operates a public water system and has a duty to exercise due care and diligence in the maintenance and supervision of all sources of the public water systems to prevent, so far as possible, their pollution and depletion, pursuant to New York laws and regulations, and 42 U.S.C. §300f et seq. (1974).

3.      As a public water supplier, Plaintiff has a duty to take the necessary steps to ensure the protection of the public health, including the undertaking of remedial feasibility studies and

1

the installation of a suitable treatment process, pursuant to New York laws and regulations, and 42 U.S.C. §300f et seq. (1974).

4.      Plaintiff has been providing potable water for its residents for many years in and around the Town of Plattsburgh, NY.

5.      In carrying out its powers, purposes and duties, Plaintiff is acting in all respects for the benefit of the people receiving its water, for the protection of their health, welfare and prosperity, as mandated by applicable laws and regulations.

6.      **Defendant United States of America ("USA")**, owns the U.S. Department of Defense its armed services branches, including the U.S. Air Force ("USAF"), and the Plattsburgh Air Force Base ("PAFB").

7.      PAFB is located at 31 Washington Road, Plattsburgh NY 12903. It is a former USAF Strategic Command ("SAC") base in New York, located on the western shore of Lake Champlain, in the Town of Plattsburgh.

8.      Defendant is responsible for the U.S. Department of Defense and its armed services branches including PAFB.

9.      PAFB was closed on September 30, 1995, as part of the (third round of) base closures mandated under the Defense Base Closure and Realignment (BRAC) Act of 1993, and its reuse is being administered by the Plattsburgh Airbase Redevelopment Corporation (PARC). Plattsburgh AFB was placed on the National Priorities List on November 21, 1989.[1]

10.     In 2015, USAF conducted a base-wide Preliminary Assessment to identify potential areas where Aqueous Film Forming Foam ("AFFF") was used and stored at the base for further sampling investigations. This assessment identified 10 areas for investigation, which included

---

[1] *See* https://extapps.dec.ny.gov/data/DecDocs/510003/ROD.HW.510003.2003-06-01.plattsburgh_afb_eod_range_ou18_SS026.pdf (Superfund Record of Decision – ROD)

aircraft crash and fire areas, AFFF storage and testing areas, fuel spill areas, and receiving surface water.[2]

11.    Upon information and belief, hazardous substances, including but not limited to PFAS and/or products containing PFOS and PFOA, and other toxic chemicals were disposed, spilled, discharged, or otherwise released into the environment, including the hydrological features from the properties operated and/or owned by Defendant.

12.    At all times relevant to this litigation, Defendant did business in New York as a consumer, user, handler and/ or disposal of hazardous substances, including but not limited to, PFAS and/or products containing PFAS, and other toxic chemicals at their facilities and/or properties, and/or said Defendant own or owned the properties upon which such actions and/or results occurred and from which hazardous substances, including but not limited to PFAS and other toxic chemicals were permitted to migrate and impact Plaintiff's water supply.

13.    At all times relevant to this litigation, Defendant disposed, spilled, discharged, or otherwise released hazardous substances, including but not limited to, PFAS and/or products containing PFAS, and other toxic chemicals at its facilities and/or properties and/or said Defendant own or owned the property at the time that such actions and/or results occurred, such that each Defendant knew or should have known that PFAS and other chemicals would be released into the soil and hydrological features and contaminate areas containing Plaintiff's water sources.

14.    As a direct result of Defendant careless and negligent acts and omissions, PFAS and other chemicals entered the soil and groundwater at its facilities and/or properties and contaminated the hydrological features from which Plaintiff draws potable water to supply its

---

[2] *See*
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0202439#:~:text=PFAS%20are%20a%20major%20component,cancer%2C%20including%20thyroid%20and%20kidney.

customers.

15.     As a direct result of Defendant's acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's water sources have become contaminated with hazardous substances, including but not limited to PFAS, and other toxic chemicals, causing damages to Plaintiff's property and requiring Plaintiff to incur costs, as described above.

16.     Defendant's wrongful actions and omissions, which are contributing to the presence of PFAS and other toxic chemicals in Plaintiff's wells, are continuing and ongoing.

17.     Any and all references to a Defendant in this Complaint include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendant.

18.     When reference is made to any act or omission of Defendant, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of Defendant committed or authorized such act or omission, or failed to adequately supervise or properly control or direct its employees while engaged in the management, direction, operation or control of the affairs of Defendant, and did so while acting within the scope of their employment or agency.

19.     Upon information and belief, Defendant is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and has caused and continues to cause injuries and damages to Plaintiff, either through the Defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance and/or control of the instrumentality causing them injury, or in some other actionable manner.

## JURISDICTION AND VENUE

20.     Pursuant to 28 U.S.C. § 1391, Plaintiff's Home Venue is the United States District Court for the Northern District of New York.

21.     This Court has personal jurisdiction over Defendant by virtue of Defendant's regular and systematic contacts with New York, and because it has the requisite minimum contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

22.     This Court has subject matter jurisdiction over Defendant pursuant to 28 U.S.C. §1331 and 42 U.S.C. § 9613(b).

23.     Plaintiff brings this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a) and 9613(g) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

24.     This Court also has subject-matter jurisdiction to adjudicate the First, Second, and Third Causes of Action, as freestanding claims under state law that are subject to Section 313 of the Clean Water Act of 1972 (as amended), 33 U.S.C. § 1323(a), which creates federal jurisdiction to adjudicate, and waives Defendant's sovereign immunity regarding, state-law requirements pertaining to certain types of water pollution, including the requirement that damages be paid for injuries proximately caused by a breach of duty under state tort law.

## BACKGROUND OF PFAS

25.     PFAS are chemical compounds containing fluorine and carbon.  These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water.  These substances are not naturally occurring and must be manufactured.

26.    PFOA and PFOS are the two most widely studied types of these PFAS substances.

27.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that it spreads readily into the environment where it breaks down very slowly; (ii) bioaccumulative and biomagnifying, meaning that it tends to accumulate in organisms and up the food chain; and (iii) toxic, meaning that it poses serious health risks to humans and animals.

28.    PFOA and PFOS easily dissolves in water, and thus they are mobile and spreads easily in the environment. PFOA and PFOS readily contaminate soils and leaches from the soil into groundwater, where they can travel significant distances.

29.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resists degradation due to light, water, and biological processes.

30.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

31.    PFOA and PFOS bioaccumulates/biomagnifies in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

32.    PFOA and PFOS biomagnifies up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and PFOS.

33.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or

environmental degradation. As a result, they migrate, and are persistent when released into the environment.

34.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

35.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

36.    The C8 Science Panel was established to provide scientific evidence that would inform future public health decisions and raise awareness among residents about potential health risks from PFAS.  Researchers began investigating the environmental and health impacts of PFAS,

37.    The C8 Science Panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

38.    In laboratory testing on animals, PFOA has caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

39.    The injuries caused by PFAS can arise months or years after exposure.

40.    The C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol.

41.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants

of concern between 2013 and 2015, including PFOA.[3]

42.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[4]

43.    On May 25, 2016, the EPA released a lifetime health advisory level (HAL) for drinking water and health effects support documents for PFOA and another type of long-chain PFAS, perfluorooctane sulfonate ("PFOS").[5] The EPA developed the HAL to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAL identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFOS. These studies indicated that exposure to PFOS and PFOA over the HAL could result in adverse health effects, including:

   a.    Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

   b.    Cancer (testicular and kidney);

---

[3] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).
[4] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.
[5] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

    c.   Liver effects (tissue damage);

    d.   Immune effects (e.g., antibody production and immunity);

    e.   Thyroid disease and other effects (e.g., cholesterol changes).

44.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[6]

45.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[7]

46.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 million to remediate PFC contamination from military bases, as well as devoting $7 million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.[8]

47.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR")

---

[6] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.

[7] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[8] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[9]

48.    On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act, which the agency characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS) nationwide."[10]

49.    On June 15, 2022, the EPA released new drinking water health advisory levels (HALs) for four PFAS, including new interim HALs for PFOS and PFOA that departed significantly from the 2016 EPA HAL they replaced.[11] Specifically, EPA issued HALs of 0.004 ppt for PFOA and 0.002 ppt for PFOS,[12] which collectively accounted for only a small fraction of the combined 70 ppt HAL that preceded them.  Importantly, EPA set these interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in a water provider's system would be sufficient on its own to exceed the new levels. Furthermore, the EPA has set a PFAS goal of 0.0 ppt (zero) for PFOA and PFOS.

50.    As support for its decision, EPA explained that the science had evolved since 2016 and that the new interim HALs for PFOS and PFOA were "based on human studies" that "found associations between PFOA and/or PFOS exposure and effects on the immune system, the

---

[9] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

[10] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020, *available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

[11] *See* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

[12] *Id.* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

cardiovascular system, human development (e.g., decreased birth weight), and cancer."[13] Specifically, EPA had performed updated health effects analyses for PFOS and PFOA to provide support for the drinking water regulations the agency planned to adopt for the two chemicals under the SDWA. Based on these analyses, EPA concluded that "the levels at which negative health effects could occur are much lower than previously understood when EPA issued the 2016 health advisories for PFOA and PFOS – including near zero for certain health effects."[14] For this reason, the agency determined there was a "pressing need to provide updated information on the current best available science to public health officials prior to finalization of the health effects assessment."[15]

51.    Because the referenced health analyses were still undergoing final review by EPA's Science Advisory Board, the agency stated that the new interim HALs for PFOS and PFOA are subject to change. EPA has indicated, however, that it does not anticipate any changes resulting in revised HALs for PFOS and PFOA that are greater than the 4 ppt minimum reporting level[16] that applies to Public Water Systems.[17]

52.    On September 6, 2022, EPA published a notice of proposed rulemaking seeking public comment on its plan to designate PFOS and PFOA as hazardous substances under

---

[13] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1-2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf.

[14] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[15] EPA Office of Water, EPA Doc. No. 822-R-22-003, *INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; EPA Office of Water, EPA Doc. No. 822-R-22-004, *INTERIM Drinking Water Health Advisory: CASRN 1763-23-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf.

[16] As EPA's website explains, the Minimum Reporting Level ("MRL") for Unregulated Contaminant Monitoring Rule (UCMR) 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.

[17] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

CERCLA.[18]   Pursuant to that notice, all comments from the public were to be submitted by November 7, 2022.

53.    On January 6, 2023, the Defense Logistics Agency within the Department of Defense published a new Military Specification  for "Fire Extinguishing Agent, Fluorine-Free Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Application," MIL-PRF-32725 ("F3 MilSpec") in accordance with § 332(a)(1) of the FY 2020 NDAA.[19] This new specification will govern fire extinguishing foams used by all Department of Defense organizations and will require such foams to test "non-detect" for PFAS. The specification further requires manufacturers to "certify in writing that PFAS has not intentionally been added to the concentrate."

54.    On April 10, 2024, EPA announced enforceable levels for PFOA and PFOS in drinking water.  EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L):

> "Considering feasibility, the EPA is promulgating individual Maximum Contaminant Levels (MCLs) for PFOA and PFOS at 4.0 nanograms per liter (ng/L) or parts per trillion (ppt). The EPA is also finalizing individual MCLGs and is promulgating individual MCLs for PFHxS, PFNA, and HFPO–DA at 10 ng/ L. In addition to the individual MCLs for PFHxS, PFNA, and HFPO–DA, in consideration of the known toxic effects, dose additive health concerns and occurrence and likely co-occurrence in drinking water of these three PFAS, as well as PFBS, the EPA is finalizing a Hazard Index (HI) of 1 (unitless) as the MCLG and MCL for any mixture containing two or more of PFHxS, PFNA, HFPO–DA, and PFBS."[20]

55.    And effective July 9, 2024, the United States Environmental Protection Agency ("EPA") designated both PFOA and PFOS as "hazardous substances" under CERCLA because EPA determined that "they may present a substantial danger to the public health or welfare or the

---

[18] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (Sep. 6, 2022).
[19] Available on the Defense Logistics Agency's website,
https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=285047.
[20] *See* PFAS National Primary Drinking Water Regulation 89 Fed. Reg. 32532 April 26, 2024.

environment when released."[21]

## **NATURE OF THE ACTION**

56.     The Plaintiff brings this action against the Defendant for contamination of its water supply wells by per- and polyfluoroalkyl substances ("PFAS") including PFOA and PFOS, which persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.

57.     Upon information and belief, hazardous substances, including but not limited to PFAS and/or products containing PFOS and PFOA, and other toxic chemicals were disposed, spilled, discharged, or otherwise released into the environment, including the hydrological features from the properties operated and/or owned by Defendant.

58.     Upon information and belief, Defendant's facility has been linked to the contamination of soil, surface water and groundwater with perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic    acid    ("PFOS"),    perfluorohexane    sulfonic    acid    (PFHxS); perfluorononanoic acid (PFNA); perfluoroheptanoic acid (PFHpA), perfluorodecanoic acid (PFDA), PFAS, and other manufactured compounds and hazardous chemicals.

59.     PFAS and other toxic chemicals were purchased, transported, used, processed, mixed, stored, handled, spilled, disposed and/or released by Defendant at the military facilities and/or properties own(ed) and/or operate(d), where these hazardous chemicals entered the soil and groundwater and, subsequently, migrated and contaminated Plaintiff's drinking water supply.

60.     Plaintiff maintains and operates a public drinking water system for the benefit of its customers, which includes five (5) deep wells. The wells are located in a predominant sandstone aquifer.

---

[21] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances 89 Fed. Reg. 39124 May 8, 2024.

61.    In 2020, Plaintiff became aware of the PFAS contamination in its water source.

62.    On April 13, 2021, Plaintiff detected its highest PFAS level in Well 6, PFOA at 2.93 ppt.

63.    On April 17, 2023, Plaintiff detected PFOA at 3.18 ppt, PFHpA at 2.44 ppt, and PFHxA at 1.59 ppt, all in Well 6.

64.    Defendant knew or reasonably should have known that these harmful compounds would inevitably reach groundwater, significantly pollute drinking water wells, render drinking water unusable and unsafe, and threaten the public health and welfare, as it has done and continues to do with respect to Plaintiff's wells.

65.    As a direct and proximate result of Defendant's acts and omissions which are the sole and direct cause of the Plaintiff's injuries, Plaintiff's water production wells have become contaminated with PFAS and other chemicals from the release and/or releases of Defendant's toxic and hazardous substances, thereby rendering the water unusable and unsafe for human consumption and daily use.

66.    Because of Defendant's careless and negligent acts and omissions, PFAS and other chemicals have contaminated Plaintiff's water source.

67.    Plaintiff's damages, caused by the above contamination, include, but are not limited to, investigation costs, testing and monitoring costs, costs of planning, design and installation of water treatment systems, treatment, operating and maintenance costs, infrastructure modifications, land acquisition to install new public water supply well(s), engineering fees and other related costs.

68.    Defendant, as the responsible party - and not Plaintiff or its costumers– should bear all past, present and future costs of addressing the above contamination.

69.    Upon information and belief, the Defendant is responsible, negligently,

14

intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through each defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## FIRST CAUSE OF ACTION
### PUBLIC NUISANCE

70.    Plaintiff reincorporates the preceding paragraphs above as though fully set forth herein.

71.    Plaintiff, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

72.    Plaintiff supplied a clean, safe, portable source of water when it was discovered that PFAS contamination had migrated to Plaintiff's water supply.

73.    Defendant by its negligent, reckless, and willful acts has caused the release of PFAS from its facilities resulting in the contamination of Plaintiff's water supply.

74.    By its actions, Defendant has unreasonably interfered and/or endangered the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater.

75.    Defendant's conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

76.    The nuisance caused by the presence of PFAS in Plaintiff's drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had a significant impact.

77.    The acts and omissions of Defendant unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Plaintiff, its residents, and business, to a safe source of drinking water of their own choosing, and have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

78.    Defendant knew or, in the exercise of reasonable care should have known, that the release of PFAS into the subsurface would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of vital groundwater resources relied upon by Plaintiff and the public.

79.    As a direct and proximate result of Defendant's conduct, it has created an ongoing public nuisance, and Plaintiff has incurred substantial damages, and will incur additional damages to remove PFAS from the public water supply so Plaintiff can provide its residents and consumers with clean and healthy water.

80.    The interference with Plaintiff's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendant's actions.

81.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## SECOND CAUSE OF ACTION
### TRESPASS

82.    Plaintiff reincorporates the preceding paragraphs above as though fully set forth herein.

83.    Plaintiff is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water.

84.    Upon information and belief, Defendant knew, or should have known, that PFAS contamination migrated through groundwater contaminating Plaintiff's real property used for collecting drinking water and the drinking water itself.

85.    The acts and omissions of Defendant caused the contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, and groundwater, contaminating Plaintiff's real property used for collecting drinking water, interfering with its property rights, including Plaintiff's right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Plaintiff's property and unlawful interference with Plaintiff's property rights.

86.    As a direct and proximate result of Defendant's conduct in creating an ongoing trespass against Plaintiff's property, in the form of the ongoing PFAS contamination of Plaintiff's water system, Plaintiff has incurred substantial damages and will incur additional damages to remove PFAS from the public water supply in order to provide its residents and customers with clean and healthy water.

87.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined at the time of trial.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

88.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

89.    Defendant knew or should have known that PFAS and PFAS containing products, and other toxic chemicals, create a substantial risk of harm to groundwater and to members of the public who consume such groundwater.

90.    Defendant knew or should have known that the chemicals containing PFAS and

other toxic substances which it was purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soil, groundwater, the aquifers and therefore, Plaintiff's water supply wells.

91.     Defendant negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS at and from its facilities and/or properties as to cause severe contamination of soil, groundwater, and/or the aquifer, and/or said Defendant own or owned the properties upon which such actions and/or results occurred.

92.     Defendant owed Plaintiff a duty to act as reasonable operator and/or owner of property and to take all necessary precautions to prevent the release of PFAS and other toxic chemicals into the soil and groundwater at their properties.

93.     Defendant owed Plaintiff a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFAS and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFAS and other toxic chemicals into Plaintiff's water source.

94.     Defendant owes Plaintiff a duty to act as reasonable operator and/or owner of property and to take all necessary steps to prevent the continuing and future release of PFAS from its facilities and/or properties.

95.     Upon learning of a release of solvents and compounds, including but not limited to PFAS containing products and PFAS and other toxic chemicals, at their facilities and/or properties, Defendant owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated Plaintiff's supply wells.

96.     Defendant breached the above duties and failed to prevent the releases of PFAS containing products at its property.

97.     Defendant also failed to take reasonable, adequate and sufficient actions to eliminate, correct, or remedy the releases of PFAS and other toxic chemicals after they occurred.

98.     Defendant continues to breach its duties to remediate and prevent ongoing and future releases of PFAS and other toxic chemicals from its properties into the groundwater that flows towards and is continuing to impact Plaintiffs' water supply.

99.     As a result of Defendant's breaches of its duties, Plaintiff has expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendant's contamination for many years into the future.

100.     Defendant's breach of its duties was the direct, sole and proximate cause of Plaintiff's damages.

101.     As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## FOURTH CAUSE OF ACTION
### COST RECOVERY LIABILITY PURSUANT TO 42 U.S.C. § 9607
### (CERCLA)

102.     Plaintiff reincorporates the preceding paragraphs above as though fully set forth herein.

103.     Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

104.     Defendant is an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

105.    Defendant's location is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

106.    PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

107.    There has been a release, and continue to be releases, and/or disposal of hazardous substances and other PFAS from the Defendant's facilities within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

108.    The hazardous substances and PFAS released from Defendant's facilities were released within the groundwater protection area for Plaintiff's drinking water wells and have and are migrating to Plaintiff's public drinking water supply.

109.    Plaintiff has incurred and will continue to incur necessary response costs to address the release or threatened release of hazardous substances and PFAS from Defendant's facilities.

110.    Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances and PFAS that have contaminated Plaintiff's public drinking water supply.

111.    By reason of the foregoing, Defendant is liable for Plaintiff's necessary response costs, and damages, regarding PFAS contamination to Plaintiff's public water supply.

## FIFTH CAUSE OF ACTION
## DECLARATORY JUDGMENT PURSUANT TO 42 U.S.C. §§ 9607(a) and 9613(g)(2)
## (CERCLA)

112.    Plaintiff reincorporates the preceding paragraphs above as though fully set forth herein.

113.    By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in the Plaintiff's public drinking water supply as referenced herein.

114.    A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendant is liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

115.    A declaratory judgment will establish Defendant's allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

116.    Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's public drinking water supply.

117.    Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances and PFAS.

118.    Plaintiff's future costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

119.    Plaintiff is thus entitled to a declaratory judgment regarding Defendant's liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment against Defendant for:

1.    Compensatory damages that exceed the jurisdictional limit of this court;

2.    Necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances that have contaminated Plaintiff's public drinking water supply, and order Defendant to reimburse the Plaintiff for its past, present, and future costs to investigate, monitor, and evaluate the PFAS that continues to migrate into Plaintiff's public water supply, including the costs of employing outside consultants and testing labs for these tasks;

3.    A declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in Plaintiff's public drinking water supply;

4.    Reasonable fees for attorneys and expert witnesses;

5.    Costs and disbursements of this lawsuit;

6.    Interest in the damages according to law; and

7.    Any other and further relief as the Court deems just, proper and equitable.


## DEMAND FOR JURY TRIAL

Plaintiff, TOWN OF PLATTSBURGH, demands a trial by jury of all issues so triable as a matter of right.

Dated:  New York, New York                    Respectfully submitted,
            January 21, 2025

**NAPOLI SHKOLNIK**

By:  */s/ Paul J. Napoli*
       Paul J. Napoli, Esq.
       1302 Avenida Ponce de León
       San Juan PR  00907
       Tel. (833) 271-4502
       pnapoli@nsprlaw.com

       Andrew W. Croner, Esq.
       Patrick J. Lanciotti, Esq.
       Nicholas H. Mindicino, Esq.
       360 Lexington Avenue, Floor 11
       New York NY  10017
       Tel. (212) 397-1000
       acroner@napolilaw.com
       planciotti@napolilaw.com
       nmindicino@napolilaw.com